## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

RICHARD THOMAS

VERSUS

USA

CASE NO. 6:24-CV-00051

JUDGE ROBERT R. SUMMERHAYS

MAGISTRATE JUDGE CAROL B. WHITEHURST

### MEMORANDUM RULING

On January 12, 2024, Richard Thomas ("Thomas" or "Plaintiff") filed the present Complaint against the United States of America ("Defendant") under the Federal Torts Claims Act[1] ("FTCA") alleging that he was injured in an automobile accident due to the negligence of Haley Justice ("Agent Justice"), an agent with the Federal Bureau of Investigation ("FBI") while in the course and scope of her employment. Defendant opposes the relief sought. A bench trial on the matter was held on June 2, 2025 and the matter was taken under advisement.

### I.
### THE TRIAL RECORD AND THE COURT'S FINDINGS OF FACT

On August 19, 2020, a motor vehicle crash occurred involving Plaintiff and Agent Justice on Saint Peter Street and Ann Street in New Iberia, Louisiana.[2] Plaintiff was operating a 2000 Chevrolet Tahoe in the left lane on Saint Peter Street and Agent Justice was operating a 2010 Dodge Charger in the right lane on Saint Peter Street.[3] The speed limit at or near the crash was 35 miles per hour.[4] Immediately before the crash, Agent Justice attempted to change lanes from the

---

[1] 28 U.S.C.A. §2671, et seq.
[2] Joint Stipulation, ¶ A, ECF 18-2.
[3] Id. ¶ B.
[4] Id. ¶ C. The Court notes that the Crash Report prepared by Lieutenant Lege states that the posted speed limit was 25 (see. Exhibit 6, p. 3). However, all other evidence, including photographs of the speed limit sign taken by Lieutenant Lege and attached to his deposition (see Exhibit 7) reflect that the speed limit was, in fact, 35 miles per hour.

right lane to the left lane on Saint Peter Street and into the lane occupied by Plaintiff.[5] As a result of the crash, Plaintiff's Tahoe struck a fire hydrant and then a brick wall on Ann Street, and Agent Justice's Charger hit a telephone pole.[6] At the time of the accident, Agent Justice was employed by the FBI and was working in the course and scope of that employment.[7]

Plaintiff testified that he was driving to his tattoo studio at the time of the accident because he had an upcoming appointment. He testified that he never saw Agent Justice's car before it impacted his vehicle. He alleges that the airbags in his vehicle deployed and that he believes he blacked out momentarily before exiting his vehicle after the accident. Plaintiff testified that he was driving the speed limit and was not in a hurry.

Agent Justice testified that on the date of the accident, she was on duty engaged in surveillance of a subject. She testified that she was in the right lane on Saint Peter Street and attempted to merge into the left lane. She stated that when she was almost entirely in the left lane, she was struck by Plaintiff's vehicle. She testified that she had not seen Plaintiff's vehicle prior to the impact but believed that he was traveling at a higher speed and that she had not seen his vehicle because it had not completely emerged from a curve in the road.

Lieutenant Roland Lege, Jr. with the Iberia Police Department testified via deposition as the officer who responded to the accident.[8] He testified that no citations were issued to either Plaintiff or Agent Justice but that his report indicates that Agent Justice committed a traffic violation, namely failure to yield. He testified that violation was a contributing factor to the accident along with the notation that Agent Justice was "some type of level of inattentive."[9] The

---

[5] *Id.* ¶ D.
[6] *Id.* ¶ E.
[7] *Id.* ¶ F.
[8] Joint Exhibit 7.
[9] *Id.*, at p. 22.

Court notes that in Lieutenant Lege's report, on the page indicating contributing factors and conditions, under "condition of driver," there is a notation of "inattentive" and in the next section entitled "driver distraction," there is a notation of "not distracted."[10] Lieutenant Lege testified that Agent Justice advised him that she believed Plaintiff was driving over the posted speed limit but that there was no physical evidence or witnesses to establish Plaintiff's speed at the time of the accident.[11] Lieutenant Lege did not obtain written statements from any witnesses.

Lieutenant Lege testified that there was a passenger in Plaintiff's vehicle. Plaintiff also testified that there was a passenger in his vehicle. Agent Justice testified that after the accident, she was unable to open her car door to exit her vehicle but that two men from the other vehicle were coming at her yelling. Neither party presented any evidence as to any testimony or statements of the passenger in Plaintiff's vehicle as to the cause of the accident. As such, the Court is unable to determine which version of events the sole third-party witness to the accident would support.

Plaintiff testified that he did not seek immediate medical attention at the time of the accident but that he started feeling pain in his neck and back later that evening and, at the recommendation of his attorney, he sought medical treatment with Recovery ChiroMed ("Recovery") on August 31, 2020. He testified that his treatment with Recovery was not successful and he then sought treatment with a pain management doctor, Dr. Ben Baronne with Louisiana Orthopaedic Specialists ("LOS"). Plaintiff testified that Dr. Ben Baronne performed two spinal injections to help alleviate his pain. He testified that the first injection helped a little bit but that he had a bad reaction to the second injection causing him to feel like he was paralyzed the day of the injection. Plaintiff testified that following that reaction, he was afraid to have any further

---

[10] Joint Exhibit 6.
[11] Joint Exhibit 7, at p. 22.

injections. The records of LOS indicated that Plaintiff had treatment from Dr. Ben Baronne from March 1, 2021 through October 11, 2021.[12]

Plaintiff testified that on November 9, 2021, he saw Dr. Lon Baronne, also with LOS, who recommended back surgery. On March 11, 2022, Dr. Lon Baronne performed lumbar surgery on Plaintiff.[13] Subsequently, due to continued neck pain, on June 23, 2003, Dr. Lon Barrone performed cervical surgery on Plaintiff. Plaintiff testified that the surgery was originally scheduled for January 27, 2023, but that he postponed the surgery because he had an opportunity to possibly appear on a Netflix television show. Plaintiff last saw any physician at LOS on July 14, 2023.[14] Dr. Lon Barrone testified via deposition and opined that Plaintiff's lumbar and cervical surgeries were necessary and were a result of the accident of August 19, 2020.[15] He also testified that as a result of the accident and the two prior surgeries, Plaintiff would require a future adjacent level lumbar fusion surgery in approximately thirteen years and a future adjacent level cervical fusion surgery in approximately fifteen to eighteen years.[16]

Todd Capielano, a certified life care planner, testified as to the life care plan for Plaintiff's future medical expenses. Mr. Capielano relied on information obtained from Dr. Lon Baronne regarding Plaintiff's future medical expenses, which included the future adjacent level lumbar fusion and the adjacent level cervical fusion along with the associated costs of each procedure. Mr. Capielano testified that the lumbar procedure along with associated costs would total between $296,117.39 on the low end and $317,883.30 on the high end and that the cervical procedure along with associated costs would total between $130,195.23 on the low end and $154,179.49 on the

---

[12] Joint Exhibit 14.
[13] *Id.*
[14] *Id.*
[15] Joint Exhibit 8, p. 24.
[16] *Id.*, at p. 25.

high end.[17] Defendant presented the testimony of Stony Landry, who is also a certified life care planner. Mr. Landry did not prepare a separate life care plan but rather testified regarding certain expenses contained in Mr. Capielano's life care plan. Mr. Landry agreed in large part with Mr. Capielano's life care plan including the need for both future procedures. Mr. Landry pointed out issues in four aspects of Mr. Capeilano's life care plan, namely: (1) the cost of the lumbar procedure; (2) the cost of the lumbar MRI; (3) the cost of the cervical MRI; and (4) the cost of physical therapy sessions. Mr. Landry testified that he obtained the costs for each of these items by contacting a number of local providers.

## II.
### CONCLUSIONS OF LAW

Plaintiff's claims are brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671-80, which "provides broadly that the United States will accept liability for common torts committed by its agents to the same extent and in the same manner as liability would attach to a private individual in similar circumstances."[18] Jurisdiction is granted by 28 U.S.C. § 1346(b)(1). The substantive law of Louisiana applies to the claims brought in this suit.[19]

"Louisiana Civil Code Article 2315(A) provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." The duty/risk analysis assists in the determination as to "fault" and requires the establishment of the following elements: (1) whether the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) whether the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) whether the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) whether the defendant's substandard conduct was

---

[17] Joint Exhibit 11.
[18] *Williamson v. U.S. Dept. of Agriculture*, 815 F.2d 368, 374 (5th Cir. 1987).
[19] *Cleveland ex rel. Cleveland v. U.S.*, 457 F.3d 397, 403 (5th Cir. 2006); *see also* 28 U.S.C. § 1346(b)(1).

a legal cause of the plaintiff's injuries (the scope of protection element); and (5) whether the plaintiff was damaged (the damages element)."[20] "In an action to recover damages for injuries allegedly caused by another's negligence, the plaintiff has the burden of proving negligence on the part of the defendant by a preponderance of the evidence. Proof is sufficient to constitute a preponderance when the entirety of the evidence, both direct and circumstantial, shows the fact sought to be proved is more probable than not."[21]

As far as the "rules of the road," a vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.[22] No person shall drive a vehicle at a speed greater than is reasonable and prudent under the conditions and potential hazards then existing and in no event at a speed in excess of the posted speed limit.[23]

More than one party may be at fault for the damages sustained in a motor vehicle accident, which is reflected in Louisiana's comparative negligence scheme.[24] In deciding which parties are responsible, a duty-risk analysis is used in which the plaintiff must prove that: (1) the conduct in question was the cause-in-fact of the resulting harm; (2) the defendants owed a duty to the plaintiff, which the defendants breached; and (3) the risk of harm was within the scope of protection afforded by the duty breached.[25] The allocation of fault between comparatively negligent parties is a finding of fact.[26] In apportioning fault, the fact finder shall consider both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages

---

[20] *Cobb v. Delta Exports, Inc.*, 2005-509 (La. App. 3 Cir. 12/30/05), 918 So. 2d 1080, 1088, *writ denied*, 2006-0225 (La. 4/24/06), 926 So. 2d 551 (internal citations omitted).
[21] *Hanks v. Entergy Corp.*, 2006-477 (La. 12/18/06), 944 So. 2d 564, 578 (internal citations omitted).
[22] La. Stat. Ann. § 32:79.
[23] La. Stat. Ann. § 32:64.
[24] *Fontenot v. Patterson Ins.*, 2009–0669 (La.10/20/09), 23 So.3d 259, 267 (citing La. Civ. Code art. 2323).
[25] *Id.*
[26] *Sims v. State Farm Auto. Ins. Co.*, 98–1613 (La.3/2/99), 731 So.2d 197, 199.

claimed.[27] In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned by the fact finder, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought."[28]

    In a personal injury suit, a plaintiff bears the burden of proving a causal relationship between the injury sustained and the accident that caused the injury.[29] Under Louisiana law, "[a] claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition."[30] "A tortfeasor is required to pay for the medical treatment of the victim, and even for overtreatment or unnecessary treatment, unless such treatment was incurred by the victim in bad faith."[31] Nevertheless, "[a]n injured party has a duty to take reasonable steps to mitigate his damages.[32]

---

[27] *Gibson v. State Through Dept. of Transp. and Development,* 95–1418 (La.App. 1st Cir.4/4/96), 674 So.2d 996, 1005, *writs denied,* 96–1862, 96–1895, 96–1902 (La.10/25/96), 681 So.2d 373–74 (citing *Campbell v. Louisiana Dept. of Transp. and Development,* 94–1052 (La.1/17/95), 648 So.2d 898, 902).
[28] *Schexnayder v. Bridges,* 2015-0786 (La. App. 1 Cir. 2/26/16), 190 So. 3d 764, 773 (citing *Watson v. State Farm Fire and Cas. Ins. Co.,* 469 So.2d 967, 974 (La.1985)).
[29] *Maranto v. Goodyear Tire & Rubber Co.,* 650 So.2d 757, 759 (La. 1995).
[30] *Id.* at 761 (quoting *Housley v. Cerise,* 579 So.2d 973 (La. 1991); *see also Fair v. Allen,* 669 F.3d 601, 605 (5th Cir. 2012)).
[31] *Ezzell v. Miranne,* 84 So.3d 641, 654 (La. 5 Cir. 2011); *see also Vines v. Wood,* 785 So.2d 126, 131 (La. 2d Cir. 2001); *Antippas v. Nola Hotel Group, LLC,* 265 So.3d 1212, 1218 (La. App. 4 Cir. 2019); *Menard v. Lafayette Ins. Co.,* 31 So.3d 996, 1006 (La. 2010).
[32] *Aisole v. Dean,* 574 So.2d 1248 (La.1991); *Britt v. City of Shreveport,* 45,513 (La.App.2d Cir.11/03/10), 55 So.3d 76; *Fletcher v. Simmons,* 37,758 (La.App.2d Cir.10/29/03), 859 So.2d 292." *Young v. Marsh,* 49,496 (La. App. 2 Cir. 11/19/14), 153 So. 3d 1245, 1256.

Louisiana law permits awards for future medical expenses, but they "must be established with some degree of certainty."[33] "The proper standard for determining whether a plaintiff is entitled to future medical expenses is proof by a preponderance of the evidence the future medical expense will be medically necessary."[34]

General damages, which cannot be "fixed with pecuniary exactitude" take into account mental and/or physical pain and suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of lifestyle which cannot be definitely measured in monetary terms, both in the past and to be anticipated in the future.[35] "Vast discretion is accorded the trier of fact in fixing general damage awards."[36] "The factors to be considered in assessing quantum of damages for pain and suffering are severity and duration. More specifically, the nature, relative severity, and extent of bodily injuries are qualitative factors that must first be considered by the trier of fact in awarding general damages. The duration of a plaintiff's injury symptoms and the duration of treatment are quantitative factors that must also be taken into account."[37]

### III.
### APPLICATION OF FACTUAL FINDINGS TO THE LAW

#### A. Liability and Allocation of Fault

The Court finds by a preponderance of the evidence that Agent Justice was negligent when she merged into the lane being occupied by Plaintiff and that her negligence was a cause of Plaintiff's injuries. However, the Court must next address whether Plaintiff was also negligent in traveling above the posted speed limit. The parties have stipulated that the posted speed limit was

---

[33] *Duncan v. Kansas City Southern Railway Co.*, 773 So.2d 670, 685 (La. 2000).
[34] *Menard v. Lafayette Ins. Co.*, 31 So.3d 996, 1006 (La. 2010).
[35] *Duncan*, 773 So.2d at 682.
[36] *Id.* at 682.
[37] *Young v. Marsh*, 49,496 (La. App. 2 Cir. 11/19/14), 153 So. 3d 1245, 1252 (citing *LeBlanc v. Stevenson*, 00–0157 (La.10/17/00), 770 So.2d 766; *Thongsavanh v. Schexnayder*, 09–1462 (La.App. 1st Cir.05/07/10), 40 So.3d 989, *writ denied*, 10–1295 (La.09/24/10), 45 So.3d 1074)).

8

35 miles per hour. Plaintiff testified that he was not traveling over the speed limit and that he was not in a hurry. Agent Justice testified that based upon Plaintiff's car appearing suddenly and the resulting crash, she believed Plaintiff was driving at a high rate of speed. Agent Justice also informed Lieutenant Lege at the time of the accident that she believed Plaintiff was speeding. Lieutenant Lege testified that there was no physical evidence to establish that Plaintiff was driving above the posted speed limit. After reviewing the evidence in the record, the Court finds Agent Justice's testimony in this regard to be the most credible, particularly in light of the resulting damage to both vehicles and the physical injuries suffered by Plaintiff. Considering that the vehicles were traveling in the same direction and parallel to one another, it is not credible that Plaintiff's vehicle was traveling at the 35 mile-per-hour speed limit (or less) given the extent of the damage to both vehicles. Plaintiff testified that both airbags in his vehicle deployed and that he hit a fire hydrant and then a brick wall as a result of the crash. Agent Justice's vehicle crashed into a light pole and she was unable to open her door as a result of the impact with Plaintiff's vehicle. The Court finds that the most logical conclusion is that Plaintiff was driving at an excessive speed which contributed to the accident occurring as well as the severity of his injuries.

As far as allocating fault between Plaintiff and Agent Justice, the Court has considered both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages claimed.[38] "In assessing the nature of the conduct of the parties, the Court has considered: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior, and

---

[38] *Gibson v. State Through Dept. of Transp. and Development,* 95–1418 (La.App. 1st Cir.4/4/96), 674 So.2d 996, 1005, *writs denied,* 96–1862, 96–1895, 96–1902 (La.10/25/96), 681 So.2d 373–74 (citing *Campbell v. Louisiana Dept. of Transp. and Development,* 94–1052 (La.1/17/95), 648 So.2d 898, 902).

(5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought."[39] Considering these factors, the Court finds that Agent Justice was eighty percent at fault and Plaintiff was twenty percent at fault for the accident.

### B.    Property Damages.

Although Plaintiff's Form 95 Claim[40] contains a claim for property damage in the amount of $5,000, there was no evidence submitted regarding this claim and the parties did not address a property damage claim at trial. Plaintiff testified that the Tahoe he was driving which was involved in the crash was undriveable and remained parked in his yard at the time of trial. Plaintiff testified that he subsequently purchased a new vehicle. The Court assumes that the property damage claim was related to the Tahoe but no evidence was submitted to establish any level of property damage. It is unclear whether Plaintiff intentionally abandoned this claim or simply failed to submit evidence to support the claim. In either case, the Court can award no damages for property damage as Plaintiff has not submitted any evidence whatsoever to support that claim.

### C.    Past Medical Expenses.

Plaintiff has submitted evidence that his past medical expenses total $395,512.97. Defendant has submitted no evidence to dispute either the accuracy of those costs or that the August 19, 2020 accident caused the injuries to Plaintiff. The Court finds that Plaintiff has met his burden of proof regarding past medical expenses and is entitled to recover the sum of $395,512.97. This amount will be reduced to an award of **$316,410.38** to account for Plaintiff's comparative fault.

---

[39] *Schexnayder v. Bridges*, 2015-0786 (La. App. 1 Cir. 2/26/16), 190 So. 3d 764, 773 (citing *Watson v. State Farm Fire and Cas. Ins. Co.,* 469 So.2d 967, 974 (La.1985)).
[40] Joint Exhibit 5.

### D.      Future Medical Expenses.

Dr. Lon Baronne testified that as a result of the accident and the two prior surgeries, Plaintiff would require a future adjacent level lumbar fusion surgery in approximately thirteen years and a future adjacent level cervical fusion surgery in approximately fifteen to eighteen years.[41] Defendant presented no evidence to dispute either the need for the two future surgeries or that the need for those surgeries as the accident with Agent Justice. Defendant only disputes certain costs associated with those surgeries.

### 1.      Cost of Lumbar Procedure.

Mr. Capielano testified that his estimate of the cost of the future adjacent level lumbar fusion surgery included a facility fee of $155,000. Mr. Landry testified that his estimate for that fee was $95,000. Mr. Capielano testified that he believed the difference in the two figures was a result in his estimate including instrumentation. After reviewing the evidence in the record, the Court believes that Mr. Capielano's explanation was accurate, particularly in light of the fact that the cost for Plaintiff's prior surgery in March of 2022 at Park Place Surgical Hospital was $153,192.07, a cost very similar to the estimate provided by Mr. Capielano. The Court will therefore accept the estimate of Mr. Capielano in this regard.

### 2.      Cost of MRI.

Mr. Capielano included estimates for pre and post operative MRIs within his summary of expenses of both the future lumbar fusion surgery and the future lumbar fusion surgery. Those costs were estimated at between $1,762 and $4,883 per MRI. Mr. Capielano obtained those figures from a database called Fairhealth which summarizes billed charges for specific procedures

---

[41] *Id.*, at p. 25.

performed within a specific location. Mr. Landry testified that he contacted numerous local providers for these services and estimated the costs to be $490 to $600 per MRI. Mr. Capielano testified that his estimates from Fairhealth included the total cost of those procedures, including the costs of the procedure as well as the cost of the professional who would review the images. Mr. Landry's estimate would appear to only include the fee charged by the facility. The Court will accept Mr. Capielano's estimate for the MRIs.

### 3.    *Physical Therapy.*

Defendant challenges both the need for and the cost of the physical therapy services provided by Mr. Capielano following both of the future surgeries. Although both the records from Dr. Baronne and the testimony of Dr. Baronne indicate that Plaintiff was prescribed physical therapy for both of his two prior surgeries, Plaintiff never went to physical therapy. Plaintiff testified that he never understood that physical therapy was recommended by Dr. Baronne but that he had some exercises to do at home. The Court finds that the evidence established that Dr. Baronne directed Plaintiff to go to physical therapy following his prior surgeries and he chose not to do so. In light of the evidence in the record, the Court finds it doubtful that Plaintiff would attend physical therapy for any future surgeries. The Court thus finds that Plaintiff is not entitled to recover the expenses estimated for those services.

### 4.    *Present Value Calculations.*

Both parties submitted expert reports from economists to translate the future medical costs into present value. The Court has reviewed the reports from G. Randolph Rice on behalf of the Plaintiff[42] and from John R. Page on behalf of the Defendant.[43] Neither party presented any testimony or evidence to rebut the conclusions in either report and the analyses of the experts

---

[42] Joint Exhibit 9.
[43] Joint Exhibit 10.

appear similar. The differences in the reports are based primarily on each economists' reliance on the respective life care plans provided by their respective client. As the Court has concluded that opinions of Mr. Capielano are more reliable on all aspects except for the disallowance of future costs for physical therapy, the Court will accept the calculations of Dr. Rice as to the present value calculation and exclude the costs of physical therapy from those numbers. The Court will therefore allow a total of $442,530 in future medical costs, representing $309,126 for the future adjacent level lumbar fusion surgery and associated costs and $133,404 for the future adjacent level cervical fusion surgery and associated costs. This amount will be reduced to an award of **$354,024.00** to account for Plaintiff's comparative fault.

###### E.    General Damages.

Plaintiff is entitled to general damages in this matter. Plaintiff testified regarding the pain he was in following his two prior surgeries. However, Plaintiff delayed his second surgery in order to participate in an opportunity to appear in a Netflix series. Further, Plaintiff only attended one follow up appointment after his cervical surgery and never attended any physical therapy as directed by Dr. Baronne. Plaintiff testified that while he can still perform the work he performed prior to the accident, namely being a tattoo artist, he cannot perform at the same level. However, Plaintiff is making no claim for either lost wages or lost earning capacity which would indicate that the accident had little impact on Plaintiff's ability to earn income.  Considering all these factors, the Court finds that a gross award of $200,000 fully and fairly compensates plaintiff for his general injuries, including loss of enjoyment of life, and pain and suffering.[44] This amount will be reduced to an award of **$160,000** to account for Plaintiff's comparative fault.

---

[44] *See, e.g., Bellard v. American Cent. Ins. Co.*, 980 So.2d 654 (La. 2008) (plaintiff had four surgeries, including a three-level cervical fusion, a lumbar fusion, and bilateral carpal tunnel release surgeries, incurring $334,040.60 in medical expenses; plaintiff also suffered from emotional distress as a result of the accident, leading to a failed suicide attempt and treatment for depression; trial court awarded $50,000 in general damages, which the Louisiana Supreme

## IV.
### CONCLUSION

Based upon the Court's findings of fact and conclusions of law, the total damages allowed to Plaintiff, considering his comparative fault is $830,434.38. Considering the foregoing,

IT IS HEREBY ORDERED that counsel for Plaintiff shall submit a proposed judgment, approved by counsel for the defendant, within fifteen (15) days of the date of this opinion. The judgment should award costs to the plaintiff, reduced commensurate with this Court's allocation of liability, and post-judgment interest to the plaintiff, as allowed by law.[45]

THUS DONE in Chambers on this 7th day of July, 2025.


ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE

---

Court increased to $200,000); *Fontenot v. UV Ins. Risk Retention Grp., Inc.*, 359 So.3d 36 (La. App. 3 Cir. 2021) ($150,000 past, present, and future pain and suffering - three-level cervical discectomy and fusion; potential additional future surgery); *Tripp v. DG Louisiana, LLC*, 386 So. 3d 1197 (La. App. 5 Cir. 2024) (plaintiff awarded $236,000 in general damages where plaintiff required extensive treatments, including SI joint injections and fusion, certain complications from treatment that required reparative treatment and a lumbar fusion surgery that involved removing disc material, implanting a case and bone graft material and inserting screws and rods); *Jackson v. Underwriters at Lloyd's of London*, 329 So.3d 1029 (La. App. 5 Cir. 2021) ($150,000 past pain, suffering, and mental anguish/$50,000 future pain, suffering, and mental anguish - two-level cervical fusion recommended, second cervical fusion possible).
[45] Prejudgment interest is not available for claims brought under the Federal Tort Claims Act. *See* 28 U.S.C. § 2674.